## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

WILLIAM MCCRACKEN AND
JANIS MCCRACKEN,

       Plaintiffs,

v.                                                           CIVIL ACTION NO.: 2:20-CV-402

CERTAIN UNDERWRITERS AT LLOYDS
OF LONDON, SUBSCRIBING TO POLICY
NO.: BW0162517,

       Defendants.

_____

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
## <u>SUPPORTING MEMORANDUM OF LAW</u>

Defendants Certain Underwriters at Lloyd's, London Subscribing to Policy No. BW0162517 ("Underwriters") file their Motion for Summary Judgment and Incorporated Memorandum of Law, as follows:

## I.    <u>INTRODUCTION</u>

Plaintiffs William and Janis McCracken (the "McCrackens") filed this lawsuit seeking the costs from Underwriters to replace roof damage that they claim was caused during Hurricane Irma.  As an initial matter, the McCrackens failed to provide prompt notice of their alleged Hurricane Irma claim as required under the Policy.  The facts are undisputed that the McCrackens believed they had Hurricane Irma damages to their roof right after the storm and made repairs, but deliberately chose not to provide notice to Underwriters until two years later.  Florida courts have consistently held that

an insured who knows of hurricane damage, repairs the damage, and then waits years to make a hurricane claim provides late notice as a matter of law. Florida law is clear that this failure to promptly notify Underwriters is a material breach of the Policy, barring recovery.

Moreover, even if the McCrackens could get past the notice issues, the McCrackens cannot come forward with any genuine issue of fact to meet their burden of proof in this first party insurance case. Namely, the McCrackens cannot come forward with *any* evidence identifying the damage to the roof caused by wind during the policy period, which is all that is covered under their wind only, named perils Policy. Even if they could, the McCrackens also have no evidence of the actual cash value of any damages exceeding the $102,000 deductible. Even more, because they have never demanded actual cash value, which is all they are owed under the policy, Underwriters could not have breached the policy as a matter of binding Eleventh Circuit law.

At bottom, the McCrackens' case fails at every turn. They cannot demonstrate they met the Policy's duties in the event of a loss, which is presumed to have prejudiced Underwriters as a matter of law. They cannot prove any covered wind damages that occurred during the Policy period. They have no evidence of damages that are recoverable under the Policy (actual cash value), much less exceeding the Policy's $102,000 deductible. For any of one these reasons, Underwriters are entitled to summary judgment as a matter of law.

## II.    STATEMENT OF MATERIAL FACTS

1.    The McCrackens seek to recover under their insurance policy for claimed property damage to their home that allegedly occurred on or about September 10, 2017.  [Plaintiffs' Compl., ECF 3 at ¶ 8].

2.    Underwriters subscribed to Policy No. BW0162517 (the "Policy"), which was issued to the McCrackens for the policy period of May 9, 2017 to May 9, 2018. [*See* Policy, a true and correct copy is attached as Ex. A, at UW 00028].

3.    The Policy provides wind only property insurance for their home located at 15102 Frescott Way, Naples, Florida 34110 ("Property"), which includes a $3,400,000 coverage limit for the home. *Id.*

4.    The Policy includes a Special Form Windstorm or Hail Only Endorsement, which states: "[t]he insurance under the Policy is amended to be against loss by the perils of Windstorm or Hail <u>only</u>." *Id.* at UW 00066.

5.    The Policy also provides: "This policy applies only to loss which occurs during the policy period." *Id.* at UW 00046.

6.    In addition, the Policy contains a 3% Windstorm or Hail Percentage Deductible, which provides that Underwriters are only responsible for the total of all loss payable under Section I that exceeds the windstorm or hail percentage deductible. *Id.* at UW 00067.

7.    The Policy's Loss Settlement provision states, "[w]e will pay no more than actual cash value of the damage until actual repair or replacement is complete." [Policy, Ex. A at UW 00044-45].

8.     If repairs are made, the Policy provides coverage for "the necessary amount actually spent to repair or replace the damaged building." *Id.* at UW 00044-45.

9.     The Policy permits the insured to claim both actual cash value and replacement cost value, "provided [they] notify [Underwriters] within 180 days after the date of loss, of [their] intent to repair or replace the damaged building." *Id.* at UW 00045. There is no evidence the McCrackens elected either.

10.     In addition, the Policy's Duties After Loss states,

> In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage, or a representative of either:
>
> 1.     Give prompt notice to us or our agent . . .

*Id.* at UW 00044, 00071.

11.     The Policy's Suit Against Us provision states, "[n]o action can be brought against us unless there has been full compliance with all of the terms under Section I of this policy . . ." *Id.* at UW 00046.

12.     The McCrackens testified the only damages they seek are a complete "roof replacement" at the Property. [Dep. of William McCracken ("Mr. McCracken Depo."), a true and correct copy is attached as Ex. B, p. 38:1-17]; Dep. of Janis McCracken ("Mrs. McCracken Depo."), a true and correct copy is attached as Ex. C, p. 6:1-8].

13.     At the time of Irma, the McCrackens lived at the Property part-time during year, and so, neither of them were at the Property during the storm. [Mr. McCracken Depo.,

Ex. B at 10:1-16; 16:5-22].

14.     Mr. McCracken visited the home approximately a week following Irma. *Id.* at 19:25-20:9.

15.     Importantly, during this initial visit, Mr. McCracken testified that he observed damage to his Property from the storm. *Id.* at 20:24-23:24.

16.     Specifically, Mr. McCracken observed a downed tree that fell onto the corner of the house where the master bedroom was located and a downed tree on the lainai behind the house, which is essentially an exterior pool enclosure. *Id.*

17.     He also observed wind damage to the lainai.  He testified that the wind blew out the screens in the lainai and that the wind "took out the supports in between the structures of the aluminum structure." *Id.* at 22:15-23:5.

18.     Mr. McCracken noticed additional wind damage, explaining that "one of the large vents on the roof had been lifted up." [Mr. McCracken Depo., Ex. B at 23:15-24].

19.     Mr. McCracken immediately contacted Harwick Homes about repairing the alleged damage. *Id. at* 24:16-20.

20.     Mr. McCracken explained that he regularly contacted Harwick Homes to perform repairs related to the Property.  *Id.* at 23:25-24:15.

 21.     Mr. Shane Klepko, the President of Harwick Homes, testified that Harwick would retain a subcontractor to perform the repairs and/or tasks. [Deposition of Shane Klepko ("Klepko Depo."), a true and correct copy is attached as Ex. D, at 22:23-23:2].

22.     The McCrackens produced an invoice from Harwick Homes dated January 17,

2018 "FOR: IRMA DAMAGE" that totaled $9,816.38 and was based on multiple invoices from subcontractors, showing work performed from September through December 2017. [Plaintiffs' Proposals and Invoices, a true and correct copy is attached as Ex. E, at PLTF 207-212].

23.    Mr. McCracken had no reason to dispute when work was performed "if the invoices say the work was done at a certain period of time." [Mr. McCracken Depo., Ex. B, at 33:14-19].

24.    As to the roof specifically, Harwick Homes retained Mr. Tim Adams of Saint Raphael Roofing to make repairs, and subsequently, Mr. Adams inspected the Property on January 11, 2018. [*See* Dep. of Tim Adams ("Adams Depo.", a true and correct copy is attached as Ex. F, at 11:3-7; 12:3-17; 20:12-21; *see* Plaintiffs' Proposals and Invoices, Ex. E at PLTF 000460-66].

25.    Based on this inspection, Mr. Adams prepared a proposal dated January 11, 2018, and the repairs were completed. [*See* Plaintiffs' Proposals and Invoices, Ex. E at PLTF000460-67; Adams Depo., Ex. F at 20:6-7].

26.    Mr. McCracken testified that he believed the repairs that were completed and invoiced by Harwick Homes were related to Hurricane Irma damage.   [Mr. McCracken Depo., Ex. B at 26:2-15].

27.    Mr. McCracken was asked "[i]s there a reason why you or your wife didn't provide notice to my clients of that damage?," to which he responded,

> I put a call to our insurance agent, George, I believe is his name. I had somehow had a cell phone number of his. He got back to me later that day and I said, 'The place is a war zone. What do I need to do,' and he

said, "You have a $100,000 deductible. Keep every bill that you have of every repair and when it gets up to over $100,000 submit those and we'll pay for it, and I said, 'Is there anything else that I need to do,' and he said, 'just keep track of all of your expenses.

*Id.* at 28:18-29:8.

28. Mr. McCracken agreed that he "called [his] insurance agent right away and he's the one who tells [him], 'You have a $100,000 deductible. Keep those receipts and we'll let your insurer know when they get past $100,000." *Id.* at 29:14-19.

29. The McCrackens' insurance broker, however, did provide notice to Underwriters on or around January 10, 2018 for an assessment by the neighborhood association for clean-up costs in the neighborhood after the storm.  [*See* Loss Notice Dated January 10, 2018, a true and correct copy is attached as Ex. G, at UW 00466].

30. This loss notice does not mention any damages to the Property, and Mr. McCracken clarified that this notice only concerned damage to the neighborhood that was being assessed to each owner.  [*Id.*; Mr. McCracken Depo., Ex. B at 38:16-19].

31. Two days later, Underwriters, via the third party claims administrator, issued a letter acknowledging the claim for a loss assessment levied to the McCrackens, and a month later, based on the invoice for a "Hurricane Assessment" totaling $2,896, Underwriters sent a letter explaining that they would not be issuing a payment for the claim because it fell below the Policy's $102,000 windstorm deductible. [Underwriters' Letter Dated January 12, 2018, a true and correct copy is attached as Ex. H, at UW 00462; HOA Assessment Invoice, a true and correct copy is attached as Ex. I, at UW 00463; Underwriters Letter Dated February 12, 2018, a true and correct copy is

attached as Ex. J, at UW 00458].

32.    Mr. McCracken was asked, "[d]o you know why [your agent] provided notice of that invoice [for the assessment] to Underwriters but not your other damages," to which he responded, "[n]o, I don't." [Mr. McCracken Depo., Ex. B at 30:11-13].

33.    Further, even though the letter invited the McCrackens to provide more information, there is no evidence that they made any effort to notify Underwriters of the alleged Irma damage to the Property. [Underwriters' Letter Dated January 12, 2018, Ex. H, at UW 00462].

34.    In the summer of 2018, Mr. McCracken noticed that a security camera was malfunctioning, and an inspection revealed that "there was a substantial leak on that part of the roof" and that "the roof underlayment also had deteriorated because of water infiltration." [Mr. McCracken Depo., Ex. B at 32:3-33:7].

35.    Mr. McCracken contacted Harwick Homes again, which provided a proposal dated August 28, 2018 for "Roof Leak Repairs" that lists, among other things, "remove existing concrete tiles," and "re-install removed concrete tiles with single component foam adhesive." [Plaintiffs' Proposals and Invoices, Ex. E at PLTF000470-74].

36.    These repairs were completed. [*Id.* at UW 00473; Mr. McCracken Depo., Ex. B at 32:3-33:2; Adams Depo., Ex. F at 26:11-27:3].

37.    Despite claiming these August-September 2018 roof repairs were related to Irma, there is no evidence that the McCrackens provide immediate notice of them to Underwriters.

38.     There was another leak at the Property in the summer of 2019 that the McCrackens also attempt relate back to Irma, which was nearly two years earlier. [Mr. McCracken Depo., Ex. B at 34:24-35:4].

39.     After this leak was discovered in a wall in the living room, Mr. McCracken called Harwick Homes, and Mr. Adams re-visited the Property and discovered a leak near the chimney. [*Id.*; Adams Depo., Ex. F at 27:14-28:5].

40.     Harwick prepared a proposal dated July 31, 2019 to repair the alleged damages, but these repairs were not made. [Plaintiffs' Proposals and Invoices, Ex. D at PLTF000475-76; Adams Depo., Ex. E at 32:6-10].

41.     Rather, Mr. McCracken testified that "this thing is deteriorating in time and overtime [sic] and I need to get it inspected. I called Harwick and they gave me Forge and we had Forge come and do the inspection." [McCracken Depo., Ex. B at 33:20-34:23].

42.     On or around October 18, 2019, the McCrackens, through their same insurance broker, submitted a claim to Underwriters for "DAMAGE TO ROOF FROM HURRICANE IRMA. WATER LEAKING INSIDE LIVING ROOM DAMAGE DRYWALL AND MOULDING." [*See* Loss Notice Dated October 18, 2019, a true and correct copy is attached here as Ex. K, at UW 00453].

43.     In response, Underwriters retained Haag Engineering to inspect the home, who found no evidence of damages caused by Irma. [*See* Mr. Duba's Report Dated December 13, 2019, a true and correct copy of is attached as Ex. L, at UW 00107].

44.     On January 22, 2020, Mr. Adams prepared an estimate for a total roof

replacement, which totaled $159,700. [Plaintiffs' Proposals and Invoices, Ex. E at PLTF000480].

45.   Mr. Adam testified that this estimate was in response to: "I was just asked for a reroof price" by Harwick Homes. [Adams Depo., Ex. F at 32:11-33:10].

46.   Harwick Homes prepared a proposal for the McCrackens dated February 26, 2020 for the installation of a "new concrete tile roof" for $223,026, and according to other documents from Harwick Homes, this total included the $159,700 from the Saint Raphael proposal. [Plaintiffs' Proposals and Invoices, Ex. E at PLTF000228-231].

47.   Underwriters advised the McCrackens of their coverage determination to the McCrackens on February 21, 2020.  [Underwriters' Letter Dated February 21, 2020, a true and correct copy is attached as Ex. M, at 1-7].

47.   The McCrackens filed suit, and on August 4, 2021, Plaintiffs served their Amended Expert Disclosures in which they identified Mr. Christopher Sargent as a retained causation expert. [Plaintiff's Amended Expert Disclosures, a true and correct copy of which is attached as Ex. N, at 1].

48.   These disclosures also identified Mr. Adams as a hybrid expert, who would opine to "the price to perform a complete roof replacement as submitted to the presiding general contractor was $159,700 as of January 22, 2020." *Id.* at 2-3.

49.   These disclosures also identified Mr. Klepko as a hybrid expert who would opine that "the completed bid prepared for replacement of the Plaintiffs' roof along with the related required work," and that "the price to perform the complete roof replacement and related work was $223,062.00 as of February 26, 2020." *Id.*

10

50.     Mr. Sargent testified that he "lifted" certain tiles on the roof to determine whether they were damaged, although he could not testify as to how many tiles he lifted. [*See* Dep. of Chris Sargent, a true and correct copy is attached as Ex. O, at 23:2-21].

51.     In fact, Mr. Sargent does not know: (1)  how many tiles are on the roof; (2) what tiles were lifted; or (3) where the 78 allegedly damaged tiles are located on the roof. *Id.* at 20:24-21:1; 21:18-18; 22:7-10; 35:8-11; 45:9-17.

52.     Mr. Sargent did not consider any other possible causes or contributing causes of loss, even though he admits that wear and tear could have exacerbated any damage. *Id.* at 30:1-5; 36:24-37:6; 59:17-60:4.

53.     Sargent, admittedly without using any methodology, concluded that more than 25% of the roof was damaged, and thus, it should be completely replaced. *Id.* at 40:17-22; 75:13-19.

54.     Underwriters are contemporaneously filing Daubert Motions as to Mr. Sargent, Mr. Klepo, and Mr. Adams.

## III.   <u>SUMMARY JUDGMENT STANDARD</u>

For issues that Underwriters bear the burden of proof at trial, they satisfy their initial burden by demonstrating that no genuine issue of material fact exists and that no reasonable jury could find for the McCrackens on the elements of that particular issue.  *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991).  In contrast, where the McCrackens bear the burden of proof at trial, Underwriters satisfy their burden at this stage by showing

that no genuine issue of material fact exists and that the McCrackens do not have the necessary evidence to support an essential element of their claim. *Dietz v. Smithkline Beecham Corp.*, 598 F. 3d 812, 815 (11th Cir. 2010). Summary judgment is particularly appropriate to resolve questions of insurance coverage, since the interpretation of a written contract is a matter of law to be determined by the court. *Technical Coating Applicators, Inc. v. U.S. Fidelity and Guar. Co.*, 157 F.3d 843 (11th Cir. 1998); *DEC Electric, Inc. v. Raphael Construction Corp.*, 558 So. 2d 427 (Fla. 1990); *Jones v. Utica Mutual Ins. Co.*, 463 So. 2d 1153 (Fla. 1985).

## IV.   ARGUMENT AND CITATION OF AUTHORITY

### A.   The McCrackens' Two-Year Late Notice Bars Coverage

The McCrackens failed to provide notice of the alleged damage to their home for over two years, despite knowing of the alleged damage immediately after Irma and making repairs. The McCrackens' decision not to provide notice promptly bars coverage as a matter of law.

In Florida, an insured's failure to comply with a policy's conditions can result in a complete forfeiture of coverage where the policy's express language makes compliance a condition precedent to filing suit. *Kramer v. State Farm Fla. Ins. Co.,* 95 So.3d 303, 306 (Fla. 4th DCA 2012). Here, the Policy states, "we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us," and further requires an insured to "[g]ive prompt notice to us or our agent." [SOMF ⁋ 10]. Furthermore, the Policy states, "[n]o action can be brought

against us unless there has been full compliance with all of the terms under Section I of this Policy. . ."  *Id*. at ¶ 11. Thus, the Policy required the McCrackens to provide "prompt notice" of the alleged Irma loss to the roof as a condition precedent to filing suit.  *See Kramer,* 95 So.3d at 306 (holding similar policy language "causes the giving of immediate notice of the loss. . . to become condition precedent to suit").

In fact, the failure of the McCrackens to provide "prompt" notice constitutes a material breach of the Policy's post-loss conditions and precludes recovery under the Policy. *Id*. Florida law interprets the policy term "prompt" and other comparable phrases to mean that notice should be given "with reasonable dispatch and within a reasonable time in view of all of the facts and circumstances of the particular case." *State Farm Mut. Auto. Ins. Co. v. Ranson*, 121 So.2d 175, 181 (Fla. 2d DCA 1960). Indeed, "[n]otice is necessary when there has been an occurrence that should lead a reasonable and prudent man to believe that a claim for damages would arise." *Ideal Mut. Ins. Co. v. Waldrep*, 400 So. 2d 782, 785 (Fla. 3d DCA 1981). "While the question as to what is a reasonable time, depending as it does upon the surrounding circumstances, is ordinarily for decision by the trier of facts, yet when facts are undisputed and different inferences cannot reasonably be drawn therefrom, the question is for the court." *Ranson*, 121 So.2d at 182.

In fact, Florida courts routinely find late notice as a matter of law when insureds wait several years before notifying their insurer of alleged hurricane damage. *See 1500 Coral Towers Condo. Ass'n, Inc. v. Citizens Prop. Ins. Corp.*, 112 So. 3d 541, at 543-44 (Fla. 3d DCA 2013) (upholding summary judgment on the insured's failure to give

"prompt" notice of roof damage caused by a hurricane where the insured was aware of roof damage one month after the hurricane, but waited more than four years to report the damages because it was unsure if the damages would exceed the policy deductible); *Yacht Club on the Intracoastal Condo. Ass'n, Inc. v. Lexington Ins. Co.*, 599 F. App'x 875, 879 (11th Cir. 2015), *citing Kendall Lakes Towers Condo. Ass'n v. Pac. Ins. Co.,* No. 10–24310–CIV, 2012 WL 266438 (S.D. Fla. Jan. 30, 2012) (notice not prompt when given four years after Hurricane Wilma and insured waited to see whether damages exceeded deductible); *Hope v. Citizens Prop. Ins. Corp.,* 114 So.3d 457 (Fla. 3d DCA 2013) (notice not prompt where homeowner made his own repairs to property following Hurricane Wilma and did not file claim until four years later); *Soronson v. State Farm Fla. Ins. Co.,* 96 So.3d 949 (Fla. 4th DCA 2012) (notice not prompt where homeowner filed claim for damage to roof allegedly caused by Hurricane Wilma over three years after hurricane struck); *Kramer,* 95 So.3d 303 (notice not timely where homeowner alleged roof damage by Hurricanes Frances and Jeanne in 2004 and claim not filed until 2009). This is especially true when the insured performs repairs to property after a hurricane and still waits years to provide notice, like the McCrackens here. *See Yacht Club,* 599 F. App'x at 879; *Hope,* 114 So.3d 457. What is more, courts have routinely rejected the argument that an insured is excused from providing prompt notice because it is waiting for the alleged damage to exceed its deductible. *See Kramer*, 95 So. 3d at 305 (finding "untimely notice" even though "[t]he insureds reasoned that they were not required to give notice of the loss until they

knew that the loss was above their deductible"); *1500 Coral Towers* 112 So. 3d at 543-44.

Here, the facts indisputably show that the McCrackens provided late notice. Mr. McCracken testified that he observed damage to his home from Hurricane Irma within a week of the storm. [SOMF ⁋ 15-18]. He specifically observed damage to the roof and the lanai and retained Harwick to repair the damage. *Id*. at ⁋ 16-26. The McCrackens did not notify Underwriters. Then, in 2018, the McCrackens observed additional roof damage, which was repaired. *Id*. at ⁋ 34-36. And, although they attribute this to Hurricane Irma, they still did not notify Underwriters. In fact, the first time the McCrakens notified Underwriters of damage to the Property at all was in October 2019 – over two years after Irma, 19 months after initial repairs were made, and over a year after subsequent damage was discovered. *Id*. at ⁋ 42. This is late notice as a matter of law. *See 1500 Coral Towers*, 112 So. 3d at 543-44; *Yacht Club*, 599 F. App'x at 879, *citing Kendall Lakes*, 2012 WL 266438; *Hope,* 114 So.3d 457; *Soronson,* 96 So.3d 949; *Kramer,* 95 So.3d 303.

The McCrackens' only excuse for failing to provide notice was that their broker, who is not an agent of Underwriters, told them to wait until their damages exceeded the deductible. *See Essex Ins. Co. v. Zota*, 985 So. 2d 1036, 1046 (Fla. 2008) (discussing common law presumption that independent insurance broker represents insured and acts as their agent, not an agent of the insurer). Florida courts have repeatedly rejected this as sufficient reason for providing late notice of alleged hurricane damage. *See*

*Kramer*, 95 So. 3d at 305; *1500 Coral Towers*, 112 So. 3d at 543-44.  Even more, the McCrackens provide no excuse for waiting another year to provide notice after noticing other roof damage a year later.  *See, e.g., 1500 Coral Towers*, 112 So. 3d at 543-44.

Because the McCrackens failed to provide prompt notice of the alleged damage, they materially breached a condition precedent to recovering under the Policy and bringing this action.  This breach presumably prejudices Underwriters as a matter of law, and the burden shifts to the McCrackens to prove that Underwriters were not prejudiced. *Am. Integrity Ins. v. Estrada*, 276 So. 3d 905, 912 (Fla. 3rd DCA 2019).  To date, the McCrackens have not come forward with any evidence to rebut this presumption, which should entitle Underwriters to summary judgment as a matter of law.  What is more, there is nothing in the record to suggest that providing notice two years after a storm and after repairs are made, which completely prevents Underwriters from inspecting the claimed damages, did not prejudice Underwriters.

In sum, the McCrackens failed to provide prompt notice, prejudicing Underwriters as a matter of law.  For this reason, Underwriters are entitled to summary judgment.

### B. The McCrackens Cannot Satisfy Their Initial Burden of Proof Because They Lack Admissible Evidence Of A Covered Loss Causing Direct Physical Damage During the Policy Period

Even if the McCrackens could somehow avoid summary judgment based on their failure to comply with their post-loss obligations, they cannot meet the initial burden of proof for their breach of contract claim.  Specifically, the McCrackens

cannot come forward with evidence to create a genuine issue of material fact that the Property's roof sustained covered damages during the Policy period that exceed the Policy's $102,000 deductible.

The McCrackens purchased a named perils policy that provides limited coverage. In particular, "a named-perils policy covers only those stated perils named as included." *Royale Green Condo. Ass'n, Inc. v. Aspen Specialty Ins. Co.*, No. 07-21404-CIV-COOKE, 2009 WL 799429, at *2 (S.D. Fla. Mar. 24, 2009), *citing Fisher v. Certain Interested Underwriters at Lloyds Subscribing Contract # 242/99,* 930 So.2d 756, 758 (Fla. 4th DCA 2006). Here, the Special Form Windstorm or Hail Only Endorsement states, "[t]he insurance under the Policy is amended to be against loss by the perils of Windstorm or Hail <u>only</u>." [SOMF at ₱ 4]. Thus, the Policy only provides coverage for a loss caused by windstorm or hail. *See Evanston Ins. Co. v. Etcetera, Etc Inc.*, 424 F. Supp. 3d 1208, 1211 (M.D. Fla. 2020).

Importantly, "[i]f the policy is a named perils policy, however, the insured has the burden of proving that the damage occurred by a covered cause." *Royale Green*, 2009 WL 799429, at *2. *See Citizens Prop. Ins. Corp. v. Kings Creek S. Condo, Inc.*, 300 So. 3d 763, 766 (Fla. 3d DCA 2020) (holding "[u]nder a named perils insurance policy, [the insured] bore the burden to prove that wind, as a covered cause of loss under the policy, caused the damage to the buildings" within the applicable policy period). Thus, to succeed in this action, the McCrackens must prove that the damages being claimed were caused by windstorm or hail during the policy period. *Id.*

17

Crucially, both Florida state and federal courts require insureds to produce a qualified expert witness to testify as to what "caused" physical damage to property during the policy period. *Peek v. American Integrity Ins. Co. of Florida*, 181 So. 3d 508, 509 (Fla. 2nd DCA 2015) (explaining that plaintiff's failure to present expert testimony or other expert evidence failed to establish plaintiff's purported cause of loss).  Most relevant to this case, the United States District Court of the Southern District of Florida has explained, in a holding that was affirmed by the Eleventh Circuit, that while expert testimony is not necessary in all breach of contract cases, the vital question of what caused damage to an insured property "is not one a lay witness can answer." *Mama Jo's, Inc. v. Sparta Ins. Co.*, No. 17-CV-23362-KMM, 2018 WL 3412974, at *8-9 (S.D. Fla. June 11, 2018), *aff'd*, 823 F. App'x 868 (11th Cir. 2020). In that case, the insured did not have an expert witness that could testify as to the cause of alleged damage to its property.  *Id.*  The Court granted summary judgment to the insurer because the insured could not show that a covered loss caused "direct physical damage" to its property. *Id.*, *citing Guinn v. AstraZeneca Pharm. LP*, 602 F. 3d 1245, 1251 (11th Cir. 2010) (affirming district court's grant of summary judgment on the basis of its exclusion of the expert's testimony, where that testimony was the only evidence on the issue of causation).  Simply put, without expert testimony identifying a covered loss, the insured could not show that the insurer breached the terms of the policy.  *Id.*

The McCrackens lone causation expert is Chris Sargent.  Mr. Sargent claims that he performed a "lift" test on an undisclosed number of roof tiles.  He admittedly performed this "lift" test without any methodology and did not document any of his

findings, making replication and testing impossible.  Instead, he simply "determined" that 25% of the roof was damaged, and thus, the entire roof needs to be replaced.  This type of unsupported conjecture does not meet the *Daubert* reliability standard, and Underwriters are separately filing a motion to exclude him.  Because Mr. Sargent is the McCrackens' lone causation expert, excluding him will leave the McCrackens without any causation experts.  This is fatal to their claim because the "the insured has the burden of proving that the damage occurred by a covered cause." *Royale Green*, 2009 WL 799429, at *2; *Kings Creek*, 300 So. 3d at 766. Put differently, without any experts, the McCrackens cannot show that a named peril caused the claimed damage to the Property during the Policy period.  *Mama Jo's Inc.,* 2018 WL 3412974, at *9, *citing Companhia Energetica Potiguar v. Caterpillar Inc.*, 2016 WL 7507848, at *13 (S.D. Fla. Aug. 1, 2016).

More importantly, even if Mr. Sargent's opinions were reliable, they do not evidence that wind caused the alleged damage.  His opinion is that wind during Hurricane Irma could have caused damage to 25% of the roof, and therefore, the McCrackens are entitled to a new roof.  [SOMF at ₱ 53].  This does not help the trier of fact.  In particular, and as discussed below, the McCrackens are only entitled to the actual cash value of the property actually damaged by wind.  *Kings Creek*, 300 So. 3d at 766.  Thus, the McCrackens must identify what property, specifically which roof tiles, were damaged by wind.  Mr. Sargent does not even attempt to do this.  He does not even know how many tiles are on the roof. [SOMF at ₱ 51].  And, while his report indicates that he "observed" 78 tiles as either damaged, loose, or cracked, he cannot

identify where those tiles were located, which tiles were damaged, or even which tiles were tested for uplift. *Id.* In other words, Mr. Sargent does not help the McCrackens answer the pivotal question in this case – what damage was caused by wind only? Even worse, he does not consider any other possible causes of the damage or even other contributing causes, despite admitting that wear and tear and wind could have combined to cause the damage. *Id.* at ¶ 52.

In short, Mr. Sargent's testimony that some damage occurred, and therefore, the whole roof needs to be replaced does not show what damage was caused only by wind and is unreliable expert testimony. Therefore, Underwriters are entitled to summary judgment.

**C.    The McCrackens Cannot Show That Their Allegedly Covered Damages Exceed the Policy's Deductible**

Even if the McCrackens come forward with expert evidence to meet their threshold burden of demonstrating how the named wind peril occurred during the Policy period, the McCrackens have no evidence of the damages that it can recover under the Policy. As the insured, the McCrackens bear the burden of proving their damages exceed the Policy's applicable deductible. *Sunflower Condo. Ass'n, Inc. v. Everest Nat'l Ins. Co.*, No. 19-CIV-80743-RAR, 2020 WL 5757085, at *6 (S.D. Fla. Sept. 28, 2020) (holding "grant of partial summary judgment simply establishes that [the insured is only entitled to recover damages, if any in excess of the Policy's hurricane deductibles"). Here, the Policy contains a Windstorm or Hail Deductible endorsement that attributes a 3% deductible in the event of an alleged wind or hail loss. [SOMF at

⁋ 6].  Thus, this unambiguous Endorsement makes clear that Underwriters have no obligation to pay the McCrackens unless and until the claimed damages exceed the Policy's 3% wind deductible, or $102,000. *Id*.

The Policy allows the McCrackens to choose to receive one of two types of payment, or both. [SOMF at ⁋ 7-9].  They can choose to receive: (1) the actual cash value ("ACV") of the damage, which accounts for depreciation; (2) the replacement cost value ("RCV") of the damage; or (3) they can make a claim based on both ACV and RCV, if they notify Underwriters of their intent to repair within 180 days of the property damages.  *Id*.  These are the only available measures of damages for the McCrackens.  *See CMR Constr. & Roofing, LLC v. Empire Indem. Ins. Co.*, 843 F. App'x 189, 192 (11th Cir. 2021).  The McCrackens elected neither.

To recover the RCV of the damage, the McCrackens must actually make repairs or replace the property.  In particular, the Policy provides that Underwriters will not pay on a replacement cost basis "until actual repair or replacement is complete." [SOMF at ⁋ 7].  The Eleventh Circuit recently reiterated that, to recover replacement costs under this type of insurance contract, ***the insured must actually complete the repairs.***  *CMR*, 843 F. App'x at 192 (finding similar policy language "means that [the insurer] was not obligated to pay [the insured] the replacement cost value until [the insured] had actually made the repairs and incurred the costs of doing so") (emphasis added); *Buckley Towers Condo., Inc. v. QBE Ins. Corp.*, 395 F. App'x 659, 663 (11th Cir. 2010) (finding "Florida courts have upheld similar contracts that expressly require

repair before claiming RCV damages"). Therefore, the McCrackens cannot recover RCV unless they actually repair the alleged damage. *Id.*

Here, the McCrackens continue to seek the estimated costs to replace the entire roof. [SOMF ⁋ 12]. To this end, the McCrackens disclosed damages experts to provide facts and opinions on "the price to perform the complete roof replacement" and "the completed bid prepared for replacement of the Plaintiffs' roof," which was corroborated by their deposition testimony and proposals. [SOMF at ⁋ 44-46, 48-49]. But, the McCrackens have *no* evidence that they actually replaced the roof, as detailed in the proposals. Because "actual repair or replacement" is not complete, these amounts are not owed. *See CMR*, 843 F. App'x at 192. In other words, they cannot rely on these replacement cost estimates to prove their damages exceed the deductible. *See Sunflower Condo.*, 2020 WL 5757085, at *6. At most, to the extent they did anything, they made roof repairs caused by unknown perils because they were made before Underwriters were provided notice. Even if one could speculate these repairs were for wind damage, those costs fall well-below the Policy's $102,000 deductible.

Because RCV is unavailable, the only available measure of damages under the Policy is the actual cash value ("ACV") of the damages caused by wind. The McCrackens have never sought the ACV of the damages. This is dispositive. In particular, the Eleventh Circuit, applying Florida law, held that this provision was "plain and unambiguous" and that an insurer is "not obligated to pay [the insured]" unless it "had actually made the repairs and incurred the costs of doing so." *See CMR*, 843 F. App'x at 192. The Court then held that the insurer could not have breached the

policy because the insured continued to seek the replacement cost value of damaged property when it was only entitled to its actual cash value.  *Id*.  In so holding, the *CMR Construction* Court explained that the insurer "could not have breached by not paying [the insured's] replacement cost value because [the insured] had not made any repairs covered by the policy; and certainly not the millions of dollars' worth that [the insured's] estimate lists and that [the insured] seeks in this lawsuit."  *Id*.  Important here, the Eleventh Circuit further held that the insurer "could not have breached the insurance policy based on the actual cash value because [the insured] did not and does not seek actual cash value."  *Id*. at 192-93.

The facts here are nearly identical to those in *CMR Construction.*  The McCrackens were clear that: (1) they were seeking the costs to replace the roof in its entirety; and (2) that they have not replaced the roof.  Because they have not repaired or replaced the Property, Underwriters "could not have breached" the Policy by failing to pay the full amount of the RCV estimate. *See CMR*, 843 F. App'x at 192-93. By that same token, Underwriters could not have breached the Policy because the McCrackens have never sought ACV at any point in the life of this claim or during this lawsuit. *Id*.

But, even if the McCrackens sought ACV, they do not have any evidence of the ACV of the alleged damages.  Neither of the proposals[1] calculate for depreciation, which is required for any calculation of ACV.  *See Buckley Towers*, 395 F. App'x at 666

---

[1] [SOMF at ⁋ 46, 51].

(holding "depreciation is necessarily part of actual cash value damages"); *Am. Reliance Ins. Co. v. Perez*, 689 So.2d 290, 291 (Fla. 3d DCA 1997).   Even more, these proposals are not limited to the tiles damaged by wind during Irma.  In particular, relying on Mr. Sargent, the McCrackens claim that they can recover the costs to replace the entire roof because 25% of it was damaged.   Yet, there is no provision in the Policy that provides recovery for a whole roof if 25% is damaged.  Even more, as the Florida 3rd DCA recently affirmed, an ACV estimate is limited to the "insured loss," which is the property that was *actually* damaged.  *Vazquez v. Citizens Prop. Ins. Corp.*, 304 So. 3d 1280, 1285 (Fla. 3d DCA 2020).   Thus, the costs to replace a roof are not included in calculating the ACV of the "insured loss." *Id.*  Put differently, the McCrackens are not entitled to recover the RCV of property when there is no evidence that it was damaged by wind.  For this reason, the repair proposals are irrelevant and do not provide any evidence of the McCrackens' damages under the Policy.

In sum, the McCrackens have never sought the only damages they are owed under the Policy.  In fact, they have no evidence of this damages and they cannot establish that their claimed damages exceed the deductible, a threshold element of their case.  *See Sunflower Condo.*, 2020 WL 5757085, at \*6. Therefore, the McCrackens cannot prevail in this action as a matter of law, and Underwriters are entitled to summary judgment.

## V.   CONCLUSION

For the foregoing reasons, Underwriters respectfully request that this Court GRANT Underwriters' Motion for Summary Judgment and enter an Order dismissing

all of the McCrackens' claims with prejudice.

Respectfully submitted this 1st day of December, 2021.

**WOOD, SMITH, HENNING & BERMAN LLP**
1230 Peachtree Street, Suite 925
Atlanta, Georgia 30309
Telephone: 470-552-1152
Fax: 470-552-1151
rzelonka@wshblaw.com
slytle@wshblaw.com

*/s/ Richard E. Zelonka, Jr.*
Richard E. Zelonka, Jr.
FBN: 0656941

*Counsel for Certain Underwriters at Lloyd's, London*

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing ***Defendants' Motion for Summary Judgment and Incorporated Memorandum of Law*** on all parties, with the Clerk of Court using the CM/ECF system as follows:

Michael A. Cassel
Cassel & Cassel, P.A.
4000 Hollywood Blvd., Suite 685-S
Hollywood, FL 33021
pleadings@cassel.law

This 1st day of December 2021.

**WOOD, SMITH, HENNING & BERMAN LLP**
1230 Peachtree Street, Suite 925
Atlanta, Georgia 30309
Telephone: 470-552-1152
Fax: 470-552-1151
rzelonka@wshblaw.com
slytle@wshblaw.com

*/s/ Richard E. Zelonka, Jr.*
Richard E. Zelonka, Jr.
FBN: 0656941

*Counsel for Certain Underwriters at Lloyd's, London*